**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| LORI TOWNSEND,<br>AS REPRESENTATIVE ON BEHALF<br>OF AFRIKKA HARDY, an individual<br>*Plaintiff,* | |
| v. | CIVIL ACTION NO: 1:24-cv-00414 |
| G6 HOSPITALITY, LLC,<br>G6 HOSPITALITY IP, LLC,<br>G6 HOSPITALITY PROPERTY, LLC,<br>G6 HOSPITALITY PURCHASING, LLC,<br>G6 HOSPITALITY FRANCHISING, LLC,<br>MOTEL 6 OPERATING, L.P.,<br>*Defendants.* | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Lori Townsend as Representative on Behalf of the Estate of Afrikka Hardy, by and through the undersigned counsel, and respectfully submits her original complaint for damages and makes the following averments.

## SUMMARY

1. Plaintiff files this civil lawsuit seeking compensation on behalf of Estate of Afrikka Hardy, for the harm she suffered as a result of the sex trafficking Ms. Hardy endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims Ms. Hardy, with minimal risk of detection or interruption.

8. Defendants continued supporting traffickers, including Ms. Hardy's trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotels and specifically at the Motel 6 located at 3840 179th Street, Hammond, IN 46324. ("Hammond Motel

[2] 18 U.S.C. §1591(e)(3).

6"). Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

**PARTIES**

9. Plaintiff Lori Townsend as Representative on Behalf of the Estate of Afrikka Hardy, is a natural person who is currently a resident and citizen of Denver, Colorado.

10. Afrikka Hardy was a trafficked person as defined by Texas Civil Practice & Remedies Code § 98.

11. Defendant G6 Hospitality LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It has been served and appears through counsel of record.

12. Defendant G6 Hospitality IP, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201

13. Defendant G6 Hospitality Property, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201. Upon information and belief, it owned the Motel 6 located at 3840 179th Street, Hammond, IN, 46324.

14. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201

15. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

16. Defendant Motel 6 Operating, LP is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, TX 75201.

17. Defendants G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP will collectively be referred to as "G6" or "G6 Defendants." Upon information and belief, the G6 Defendants operated, controlled, and/or managed the Hammond Motel 6.

## <u>JURISDICTION AND VENUE</u>

18. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Eastern District of Texas, and all Defendants are residents of Texas.

20. G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP have the same principal place of business, which is in Carrolton, Texas, within the Eastern District of Texas. Therefore, each is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

21. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

22. Each of the G6 Defendants participated in a joint venture operating the Hammond Motel 6 from a central location at the G6 corporate offices in Carrolton, Texas, within the Eastern District of Texas. On information and belief:

a. The relationship between the G6 Defendants was centered at the G6 corporate offices in the Eastern District of Texas.

b. The G6 Defendants signed agreements with one another related to the Hammond Motel 6 from G6 corporate offices in the Eastern District of Texas.

c. The G6 Defendant exercised joint control over operations of the Hammond Motel 6 from a central location at G6 corporate offices in the Eastern District of Texas.

d. The G6 Defendants distributed revenue earned from the Hammond Motel 6 among themselves from G6 corporate offices in the Eastern District of Texas.

e. The G6 Defendants developed policies for the Hammond Motel 6 from G6 corporate offices in the Eastern District of Texas.

f. The G6 Defendants communicated with one another regarding operation of the Hammond Motel 6 from G6 corporate offices in the Eastern District of Texas.

## FACTS

### I. Afrikka Hardy was a Victim of Unlawful Sex Trafficking at a Hotels Owned, Operated, Managed, and Controlled by Defendants.

23. Ms. Hardy's trafficking began in approximately July of 2014 and until her untimely death on October 17, 2014. Ms. Hardy met her trafficker who used manipulation and coercion to force her to engage in commercial sex for her trafficker's financial benefit. Her trafficker would post ads for her online or require her to post ads for herself. Her trafficker used Ms. Hardy's financial situation against her and manipulated her into believing that this was the only way she could provide for her family.

24. At times between July 2014 until she was murdered by a john on October 17, 2014, Ms. Hardy was repeatedly and regularly trafficked at the Hammond Motel 6.

25. Ms. Hardy's trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the Hammond Motel 6, including effects on Ms. Hardy's

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that Ms. Hardy was being continually subjected to coercion, control, and exploitation.

26. Ms. Hardy remained under the control of her trafficker until her death on October 17, 2014.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

27. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Ms. Hardy.

28. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of commercial exploitation of children.[7]

29. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

30. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

31. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
- Individuals show signs of physical abuse, restraint, and/or confinement;
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
- Individuals lack freedom of movement or are constantly monitored;
- Individuals avoid eye contact and interaction with others;
- Individuals have no control over or possession of money or ID;
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
- Individuals have few or no personal items—such as no luggage or other bags;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

[9] *See Id.*

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;
- A group of girls appears to be traveling with an older female or male;
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;
- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;
- Possession of bulk sexual paraphernalia such as condoms or lubricant;
- Possession or use of multiple cell phones; and
- Possession or use of large amounts of cash or pre-paid cards.

32. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

33. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

34. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

35. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

36. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

37. The most effective weapon against sexual exploitation and human trafficking is education and training.[13] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

38. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child

---

[12] *Id.*
[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

39. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

40. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

## III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.

41. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Ms. Hardy's trafficking, that sex trafficking was ongoing and widespread at Motel 6 branded properties including the Hammond Motel 6.

42. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[16]

43. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los

[16] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility.

Angeles.[17] From this lawsuit, G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

44. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking.[18] Based on information and belief, G6 has failed to adequately implement and enforce such changes.

45. G6 intentionally ensures its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[19]

46. Public statements of the G6 Defendants confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[20] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[21]

47. Unfortunately for Ms. Hardy, the promises made by Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have

---

[17] *Motel 6 pays $250,000 to settle human trafficking suit* (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.
[18] *Id.*
[19] *Motel 6 – An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six (last visited Aug. 10, 2023).
[20] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[21] *Id.*

continued financially benefiting by providing venues for the sexual exploitation of victims like Ms. Hardy.

**a. Sex Trafficking at G6 Branded Hotels was well Known by Defendants.**

48. Upon information and belief, each of the Defendants monitored criminal activity occurring at G6 branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Ms. Hardy was trafficked.

49. Scores of news stories from across the US highlight G6's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of G6 branded hotels for sex trafficking.

50. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Motel and Studio 6 hotels for illegal activity, the following was noted:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[22]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[23]
- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[24]
- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[25]

---

[22] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[23] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[24] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[25] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[26]

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[27]

- In July 2012, a man was accused of trafficking young girls in foster care for sex. The girls often met customers at a Studio 6 in Jacksonville, Florida.[28]

- In August 2012 a person was charged with prostitution at a Studio 6 in Mentor, Ohio.[29]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[30]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[31]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[32]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[33]

---

[26] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html.

[27] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[28] *Feds: Man recruited foster care girls for prostitution*, News4Jax (July 6, 2012), https://www.news4jax.com/news/2012/07/07/feds-man-recruited-foster-care-girls-for-prostitution/.

[29] Mentor Police: Prostitute Ran Massage Parlor at Hotel, Fox8 (Aug. 3, 2012), https://fox8.com/news/mentor-police-say-prostitute-ran-make-shift-massage-parlor-at-hotel/.

[30] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[31] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[32] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.

[33] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[34]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[35]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[36]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[37]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[38]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[39]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[40]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department

---

[34] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[35] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[36] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[37] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[38] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[39] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[40] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[41]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[42]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[43]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[44]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[45]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[46]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[47]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[48]

---

[41] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.poastandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.

[42] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[43] Amanda Milkovits, Massachusetts Man Accused Of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[44] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015),https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[45] Hsing Tseng, Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

[46] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[47] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[48] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, NewsMississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[49]

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[50]

51. Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 branded properties.

52. Based on information and belief, the Defendants managed and monitored on-line reviews G6 branded hotel locations:

- 2010 TripAdvisor review out of Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[51]

- 2011 Yelp review in California states "…We paid to spend two night, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[52]

- 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that

---

[49] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[50] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

[51] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

[52] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa

Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[53]

- 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[54]

- 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[55]

- 2012 Yelp review out of Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[56]

- 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…"[57]

- 2012 TripAdvisor review out of Illinois states "I have recently been relocated with my job out here so looking for a place in glenview area. I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my

[53] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_Airport-Oakland_California.html
[54] https://www.yelp.com/biz/motel-6-salinas
[55] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html
[56] https://www.yelp.com/biz/motel-6-dallas-4
[57] https://www.yelp.com/biz/motel-6-escondido?start=60

door and getting rooms next to me as well making extreme noise so they can get me out..."[58]

- 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[59]

53. This sampling of news stories, reviews, and other public information establishes that, at the time Ms. Hardy was trafficked at the subject property, the G6 Defendants knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at G6 branded properties.

b. Sex trafficking was a brand-wide problem for G6 originating from management level decisions at their corporate offices in Carrollton, Texas.

c. G6 franchisees and hotel staff were not taking reasonable steps to detect, deter, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d. G6's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e. G6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

54. Despite the mounting evidence that sex trafficking at G6 properties was ongoing and growing, G6 Defendants continued to earn revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

**b. G6 Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Hammond Motel 6.**

[58] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html
[59] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_Buffalo-Amherst_New_York.html

55. G6 Defendants were specifically aware that sex trafficking was widespread and ongoing at the Hammond Motel 6.

56. Internet reviews for the Hammond Motel 6, which upon information and belief the G6 Defendants managed and monitored, show the obvious signs of criminal activity associated with sex trafficking at the Hammond Motel 6. For example:

- A 2013 review of the Hammond Motel 6 stated "…Our second night was greeted by what I can only refer to as a 'sizeable army of sizeable prostitutes' loudly roaming around the walkways complete with pimp escort..."[60]

- A 2014 review of the Hammond Motel 6 stated "Do not take your family here. Zero stars is too high.This place should be condemned. Hookers, drug deals, bedbugs, and all the noise that comes with it.The place was so awful we had to leave by 1:00 am."[61]

- A 2016 review of the Hammond Motel 6 stated "This place is like a 3rd world establishment ran by actuall 3rd world people. The prostitution is very inexpensive and if you go at the right time you can get a first come first serve discount. If you don't like the stains on the sheets then all you can do is make bigger ones. Don't forget, this is where a serial killer was doing his operation a few years ago, which is the reason for the cheap hardwood floors instead of blood stained carpet."[62]

- A 2021 review of the Hammond Motel 6 stated " I was able to get a full refund Obvious signs of illegal activity occurring. When I asked for refund stating I felt uncomfortable just walking across the parking lot. The manager asked if I seen drugs or prostitution occurring....clearly they know there are problems here."[63]

57. Traffickers, including Ms. Hardy's trafficker, repeatedly chose to use the Hammond Motel 6 for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Hammond Motel 6 based on obvious indicators of this activity.

---

[60] https://www.tripadvisor.com/Hotel_Review-g37170-d240184-Reviews-or5-Motel_6_Hammond-Hammond_Indiana.html
[61] https://www.yelp.com/biz/motel-6-hammond
[62] https://www.tripadvisor.com/Hotel_Review-g37170-d240184-Reviews-or5-Motel_6_Hammond-Hammond_Indiana.html
[63] https://www.kayak.com/Hammond-Hotels-Motel-6-Hammond---Chicago-Area.130002.ksp

58. Defendants, acting individually and jointly, directly participated in operation of the Motel 6 and, therefore, directly monitored and supervised activity at the hotel.

59. The Defendants are all affiliated entities subject to common control and that jointly operated the Motel 6 and shared revenue and profit from operation of the hotel.

60. All knowledge from the staff at the Hammond Motel 6 is imputed to G6. G6 knew about this widespread and ongoing trafficking at the Motel 6, including the trafficking of Ms. Hardy, through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

61. Upon information and belief, the G6 Defendants knew or should have known about the widespread trafficking at the Hammond Motel 6, based on:

a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

b. The G6 Defendants' regular monitoring of online reviews;

c. The G6 Defendants' collection and monitoring of customer surveys and complaints;

d. The G6 Defendants' regular inspections of the hotel property;

e. Information provided to the G6 Defendants by law enforcement; and

f. Other sources of information available to the G6 Defendants.

62. Upon information and belief, under the G6 Defendants' protocol, which on its face required hotel staff and management to report suspected criminal activity to the G6 Defendants, hotel staff were required to report numerous instances of suspected sex trafficking to the G6 Defendants prior to Ms. Hardy's trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Hammond Motel 6.

**c. Defendants knew Ms. Hardy was being trafficked at the Hammond Motel 6 because of the apparent and obvious "red flags" of sex trafficking.**

63. During the period that Ms. Hardy was trafficked at the Hammond Motel 6, there were obvious signs that her traffickers were engaged in sex trafficking:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.

b. Ms. Hardy's trafficker would be present at the hotel while Ms. Hardy was being trafficked there. While she was seeing clients, her trafficker would linger in the parking lot or in common areas.

c. Multiple other girls were being trafficked at the same hotel at the same time as Ms. Hardy by her trafficker and other traffickers.

d. There was heavy foot traffic in and out of Ms. Hardy's room involving men who were not hotel guests. This traffic was visible to hotel staff. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

e. Hotel cameras videoed persons coming to and from the rooms. Specifcally, there is camera footaged that shows the john who murdered Ms. Hardy, coming to her room and fleeing after he murdered her.

f. While being attacked by the john, there was a loud disturbance coming from Ms. Hardy's room, including screaming and furnature being thrown around. Ms. Hardy tried to defend herself, but, Ms. Hardy was overcomed by the john and he strangled her with a cord and he threw her lifeless, naked body in the bathtub. Ms. Hardy was also four months pregnant at the time of her death.

g. Housekeeping staff, who would observe obvious signs of the sex trafficking activity, such as excessive condoms and other sex paraphernalia.

h. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

64. Based upon information and belief, multiple employees at the Hammond Motel 6, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

65. As such, G6 knew or was willfully blind to the fact that Ms. Hardy was being trafficked at the Hammond Motel 6.

66. Given these obvious signs, G6 knew or should have known about the trafficking of Ms. Hardy based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

67. Defendants also knew or should have known about Ms. Hardy's trafficking based on the other methods, listed above, that they used to monitor and supervise the Hammond Motel 6.

## IV. Defendants actively facilitated sex trafficking at the Hammond Motel 6, including the trafficking of Ms. Hardy.

68. Defendants had both actual and constructive knowledge of the trafficking of Ms. Hardy at the Hammond Motel 6 because the trafficking was the direct result of Defendants facilitating her trafficking at the Hammond Motel 6.

69. G6 is responsible for the acts, omissions, and knowledge of all employees of the Hammond Motel 6 when operating the hotel because these acts and omissions were committed in the scope and course of employment, because G6 ratified these acts and omissions, and because G6 failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to G6, of sex trafficking occurring at Motel 6 branded locations including the Hammond Motel 6.

70. G6, through its on-the-ground hotel staff, knew or was willfully blind to the fact that Ms. Hardy was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Ms. Hardy's sexual exploitation.

71. G6, through its on-the-ground hotel staff, also facilitated widespread trafficking at Hammond Motel 6, including the trafficking of Ms. Hardy in ways including:

a. Developing a familiar relationship with the traffickers at this hotel, including Ms. Hardy's trafficker.

b. Creating an environment where traffickers knew that hotel staff would turn a blind eye and thus where traffickers could operate freely without significant risk of interference by the hotel staff.

c. Allowing traffickers to operate in ways that minimized their risk of detection by third-parties and their future traceability.

d. Accommodating requests made by traffickers.

72. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Hammond Motel 6 that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Ms. Hardy, as follows:

a. The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b. The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

c. The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

d. The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e. The G6 Defendants expressly retained control to terminate hotel staff based on the response to human trafficking.

f. The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

g. Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements specifically designed to prevent human trafficking and other criminal activity.

h. The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 and Studio 6 properties, including suspected trafficking incidents.

i. The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Hammond Motel 6.

j. The G6 Defendants maintained control over all details of the terms under which their hotels, including the Hammond Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Hammond Motel 6.

k. The G6 Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Hammond Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l. The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Hammond Motel 6, including trends that would reveal patterns consistent with human trafficking.

73. The G6 Defendants controlled the renting rooms at the Hammond Motel 6 by, among other things:

a. Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b. Defendants directly made reservations for rooms at the subject Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated.

c. Defendants established and maintained control over a brand-wide “do not rent” system. Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Motel 6 through detailed policies that it established regarding use of this “do not rent” system.

d. Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e. Defendants controlled and oversaw policies and procedures regarding check-in, payment and identity verification procedures.

f. Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel 6.

g. Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel 6 until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

74. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Hammond Motel 6, G6 continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Ms. Hardy.

75. G6 knew or should have known that Ms. Hardy was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Ms. Hardy’s sexual exploitation and ultimately her death.

76. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Hammond Motel 6, the G6 Defendants continued participating in a venture at that hotel, with the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a. The G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining hotel staff regarding issues related to human trafficking.

b. The G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training.

c. The G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties.

d. The G6 Defendants implicitly approved decisions by hotel staff not to report or respond to criminal activity including sex trafficking appropriately.

e. The G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Hammond Motel 6.

f. The G6 Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Hammond Motel 6, the G6 Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties.

h. The G6 Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i. The G6 Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j. The G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

77. If G6 had exercised reasonable diligence when operating the Hammond Motel 6, G6 would have prevented the Hammond Motel 6 from being used to facilitate widespread and ongoing sex trafficking, including the trafficking and murder of Ms. Hardy. Instead, G6 engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Ms. Hardy.

## V. Defendants’ ventures at the Hammond Motel 6.

78. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the Hammond Motel 6, including Ms. Hardy's trafficker, as follows:

a. Defendants received benefits, including increased revenue, every time a room was rented at the Hammond Motel 6.

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Hammond Motel 6, which Defendants knew or should have known about.

c. Defendants associated with traffickers, including Ms. Hardy's trafficker, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Defendants had a mutually beneficial relationship with the traffickers at the Hammond Motel 6, fueled by sexual exploitation of victims, including Ms. Hardy.

e. Sex traffickers, including Ms. Hardy's trafficker, frequently used the Hammond Motel 6 for their trafficking because of an implicit understanding that the Hammond Motel 6 was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Defendants.

f. All Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. Ms. Hardy's trafficking at the Hammond Motel 6 was a result of Defendants' participation in a venture with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Ms. Hardy's trafficking at the Hammond Motel 6.

79. Through the conduct described above, each of the Defendants also knowingly benefited from engaging in a commercial venture with other Defendants and with hotel staff as follows:

a. Defendants associated with one another and with the hotel staff to operate the Hammond Motel 6.

b. As detailed above, each Defendant received financial benefits from operating the Hammond Motel 6, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Hammond Motel 6 specifically.

d. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the widespread sex trafficking at the Hammond Motel 6.

e. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), each Defendant participated in the venture by continuing to associate with the hotel staff and with other Defendants to operate the Hammond Motel 6 in a way that the Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Ms. Hardy.

f. Ms. Hardy's trafficking at the Hammond Motel 6 was a result of hotel staff and Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Hammond Motel 6. Had Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from Ms. Hardy's trafficking at the Hammond Motel 6.

## VI. G6 Defendants are jointly responsible for the trafficking of Ms. Afrikka Hardy.

80. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

81. Upon information and belief, operation of the Hammond Motel 6 was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise

and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the Hammond Motel 6. As an integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

**VII. Defendants are Jointly and Severally Liable for Plaintiff's Damages.**

82. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiff.

83. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of Ms. Hardy's sexual exploitation and trafficking.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

84. Plaintiff incorporates all other allegations.

**I. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA**

85. Ms. Hardy is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

86. Through acts and omissions described throughout this Complaint, each Defendant received a financial benefit from participating in a venture through an ongoing business relationship with traffickers, including Ms. Hardy's trafficker, despite the fact that each Defendant knew or should have known that these traffickers, including Ms. Hardy's trafficker, was engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each Defendant is liable as a beneficiary under 18 U.S.C §1595(a).

87. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a hotel-operating venture with regarding the operation of the Hammond Motel 6 despite the fact that G6 Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

88. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Ms. Hardy to suffer substantial physical and psychological injuries, including death, and other damages because of being trafficked and sexually exploited at the Defendants' hotel.

**II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants).**

89. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

90. Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

91. On information and belief, each of the Defendants participated in a joint venture operating the Hammond Motel 6. They had highly integrated operations at the hotel, shared revenue and profits generated from the hotel, and exercised mutual control over the venture at the hotel. They functioned as a single integrated entity and/or as alter-egos of one another.

92. Each of the Defendants is vicariously liable for the TVPRA violations of each of the other Defendants.

## DISCOVERY RULE

93. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Ms. Hardy was harmed through October 17, 2014, Ms. Hardy was under coercion and control of her trafficker who abused and manipulated her. Thus,

Ms. Hardy did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before Plaintiff filed this lawsuit. While she was under the control of her trafficker, Ms. Hardy —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Ms. Hardy being kept under the control of her trafficker, which Defendants facilitated.

94. At the time Ms. Hardy was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

95. To the extent Defendants assert an affirmative defense of limitations, Ms. Hardy invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Ms. Hardy faced extraordinary circumstances, which arose through no fault of her own, that prevented Plaintiff from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit.

96. Ms. Hardy was under the control of her trafficker through October 17, 2014. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

97. To the extent Defendants assert an affirmative defense of limitations, Plaintiff also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

98. Ms. Hardy was subject to continuous trafficking at the Hammond Motel 6 through October 17, 2014, which is not more than 10 years before Plaintff filed this lawsuit.

99. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Hammond Motel 6 and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

100. Plaintiff seeks all damages to which she is legally entitled, including but not limited to damages under the survival statute, codified Texas Civil Practices and Remedies Code, § 71.

101. The Defendants acts and omissions, individually and collectively, caused Ms. Hardy to sustain legal damages recoverably by her estate and heirs, including but not limited to the following:

a. Pain and mental anguish;

b. Medical expenses;

c. Funeral and burial expenses; and

d. All other damages allowed by law and equity.

102. Plaintiff trusts the jury to evaluate the evidence and to properly assess the damages sustained; however, Texas Rule of Civil Procedure 47(c) requires Plaintiff to set forth the level of damages sought. In compliance with this Rule, and only in compliance with this Rule, Plaintiff states she expects to seek monetary relief of $1,000,000 or more for the damages asserted.

103. Plaintiff reserves the right to increase or decrease the amount she seeks based on additional discovery, evidence presented at trial, and/or the verdict of the Court.

## JURY TRIAL

104. Plaintiff demands a jury trial on all issues.

## RELIEF SOUGHT

105. WHEREFORE, Plaintiff prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Plaintiff against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Plantiff may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**By:** /s/ *Annie McAdams*
Annie McAdams | SBN 24051014
**ANNIE MCADAMS, PC**
2900 North Loop West, Suite 1130
Houston, Texas 77092
Telephone (713) 785-6262
Facsimile (866) 713-6141
annie@mcadamspc.com

and

**SICO HOELSCHER HARRIS, LLP**

/s/ *David Harris*
David E. Harris | SBN 24049273
Morgan Malouf | SBN 24127767
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*mmalouf@shhlaw.com*

**ATTORNEYS FOR PLAINTIFF**